UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
                                   :
UNITED STATES OF AMERICA           :
        Plaintiff,                 :   CIVIL NO.
                                   :
        v.                         :   3:99-CV-1772 (EBB)
                                   :
$2,350,000.00 IN LIEU OF ONE       :
PARCEL OF PROPERTY LOCATED AT 895  :
LAKE AVENUE GREENWICH,             :
CONNECTICUT, WITH ALL              :
APPURTENANCES AND IMPROVEMENTS     :
THEREON                            :
                                   :
        Defendant.                 :
                                   :
-----------------------------------X
```

## OPINION AND ORDER

During the 1990s, Martin Frankel ("Frankel") executed an international scheme of fraud and money-laundering, draining hundreds of millions of dollars from insurance companies in five states.  On May 10, 2002, Frankel entered into a plea agreement with the United States Attorney for the District of Connecticut in which he agreed to plead guilty to wire fraud, securities fraud and racketeering and, on December 10, 2004, Frankel was convicted and sentenced to 200 months incarceration.

While engaged in his fraud and money-laundering scheme, Frankel purchased a residential home at 895 Lake Avenue, Greenwich, Connecticut (the "Defendant Property").  The United States (the "Government") claims that the Defendant Property was

involved in Frankel's money-laundering scheme and therefore, on September 9, 1999, commenced this civil forfeiture against the Defendant Property pursuant to 18 U.S.C. § 981(a)(1)(A).  The Complaint alleges that the Defendant Property was involved in a money-laundering transaction in violation of 18 U.S.C. § 1956 and in a transaction in criminally derived property in violation of 18 U.S.C. § 1957.

Under the applicable statutes and precedent, once the Government commences a civil forfeiture action, it must demonstrate probable cause to forfeit the property.  If probable cause is shown, the property will be forfeited unless a third-party claimant defeats the forfeiture by showing either that the property was not involved in criminal activity or by demonstrating that it is an innocent owner of the property.

In this forfeiture action, two claimants allege that they are innocent owners of the Defendant Property and have filed claims to defeat the Government's forfeiture of the property. One of these claimants is a group comprised of the receivers and liquidators for seven now-insolvent insurance companies that were looted by Frankel (the "Receiver-Claimants").  The other claimant is an individual, Cheryl Lacoff ("Lacoff").

A bench trial in this case was held September 23-30, 2009. Based on the following findings of fact and conclusions of law, the Court holds that, although the Government established

probable cause to forfeit the Defendant Property, the forfeiture is defeated by the innocent owner claim of the Receiver-Claimants.

**FINDINGS OF FACT**

I.  The Crimes of Martin Frankel

An investigation by the Internal Revenue Service ("IRS") and the Federal Bureau of Investigation ("FBI") revealed that Frankel devised and executed a scheme to defraud multiple insurance companies across the country using wire transfers and to launder the proceeds of that fraud in violation of 18 U.S.C. §§ 1956 and 1957.  Frankel committed these criminal activities using several aliases and corporate entities, one of which was Sundew International Ltd. ("Sundew").

The insurance companies that were victimized by Frankel's fraud were: Franklin American Life Insurance Company ("FAL"), domiciled in Tennessee; International Financial Services Life Insurance Company ("IFS"), domiciled in Missouri; Farmers & Ranchers Life Insurance Company ("FRL"), domiciled in Oklahoma; Old Southwest Life Insurance Company ("OSL"), domiciled in Arkansas; Franklin Protective Life Insurance Company ("FPL"), domiciled in Mississippi; Family Guaranty Life Insurance Company ("FGL"), domiciled in Mississippi; and First National Life Insurance Company of America ("FNL"), domiciled in Mississippi (collectively, the "Insurance Companies").

Specifically, Frankel, through fraudulent pretenses, representations and promises, obtained control of the liquid assets and insurance policy premium proceeds of the Insurance Companies through acquisition of the companies, reinsurance or other agreements.  He then systematically looted and laundered the assets of the Insurance Companies, by, among other means, transferring the assets to bank accounts under his control in Switzerland.

On May 10, 2002, Frankel entered into a plea agreement with the United States Attorney for the District of Connecticut in which he agreed to plead guilty to multiple counts of a superseding indictment charging him with wire fraud, securities fraud and racketeering.  As part of his plea agreement, Frankel waived all claims to assets obtained by or traceable to his criminal activities, including all assets subject to forfeiture proceedings.

With regard to the Defendant Property, Frankel admitted that on January 20, 1999, he wire transferred funds in the amount of $2,331,643.14 from an account at Banque SCS Alliance, Switzerland, account number 70026, to Chase Manhattan Bank, account number 586-1-508728, in Connecticut to purchase the Defendant Property.

On December 10, 2004, Frankel was convicted and sentenced to 200 months incarceration.  On that same date, the Court

4

entered an order directing Frankel to make restitution to the Insurance Companies in the total amount of $204,164,215.79.

II.  The Defendant Property

The Defendant Property consists of a dwelling house and property located in Greenwich, Connecticut.  At trial, the Receiver-Claimants offered the expert testimony of a forensic accountant who traced the funds used by Frankel to purchase the Defendant Property.  The IRS case agent assigned to the Frankel fraud investigation also testified.  The uncontroverted testimony of both witnesses was based on the types of documentation that is both reliable and commonly used in this type of investigation.  Through the testimony of these witnesses, the Receiver-Claimants established that the funds used to purchase the Defendant Property came from Frankel's looting of the Insurance Companies.

In sum, Frankel directed the transfer of funds he looted from the Insurance Companies to bank accounts he controlled in Switzerland at Banque SCS Alliance.  Once in his Swiss bank accounts, Frankel directed the transfer of those funds from Banque SCS Alliance Account #70026 ("SCS Account #70026") to his attorney's bank account for the purchase of the Defendant Property in the name of Sundew.  Sundew became the owner of the Defendant Property on January 19, 1999 through the conveyance of a warranty deed for a purchase price of $2,575,000.00.

A.  Tracing the Funds Used to Purchase the Defendant
Property

In November 1991, Frankel caused two wire transfers to be
deposited into Banque SCS Alliance Account #70023 ("SCS Account
#70023"), a transit or house account that he controlled.  The
first deposit was for $17.9 million and the second was for $1.76
million.  The $17.9 million wire transfer consisted of the
assets of FAL.  Of the $1.76 million wire transfer, $260,000.00
consisted of additional money that Frankel looted from FAL.  The
origin of the remaining $1.5 million of the $1.76 million wire
transfer is unknown.  Thus, all but $1.5 million of the deposits
into SCS Account #70023 are traceable to looted Insurance
Company funds.  There is no evidence that any other party has
stepped forward and asserted a claim to these funds.

Also in November 1991, shortly after the $17.9 million and
$1.76 million deposits were made into SCS Account #70023,
Frankel directed a wire transfer in the amount of $11.3 million
from SCS Account #70023 to the National Bank of Detroit.
Frankel instructed that the $11.3 million wire transfer to the
National Bank of Detroit be used to pay off investors in a
previous investment program he set up known as "Creative

Partners."[1]  After the investors were paid, the remaining funds in the account at the National Bank of Detroit were dissipated.

After transferring the $11.3 million to the National Bank of Detroit, Frankel transferred the remaining funds in SCS Account #70023, approximately $8.3 million, to an account at Bank Brussels Lambert for a few days.  The funds were then transferred from Bank Brussels Lambert into SCS Account #70026 in two separate deposits, which constituted the "initiating" or first deposits into SCS Account #70026.  The first deposit of approximately $8 million was made into SCS Account #70026 in late December 1991.  The second deposit of approximately $360,000 occurred in early January 1992.

The initial $8.3 million deposited into SCS Account #70026 can be traced to funds from SCS Account #70023 and, as noted, at the time of the transfer, SCS Account #70023 contained, at most, only $1.5 million of possible non-Insurance Company funds.  Thus, SCS Account #70026 could have contained at most only $1.5 million in possible non-Insurance Company funds as of early January 1992.

---

[1] Creative Partners was an investment program set up by Frankel and his associates in 1989.  The program was a fraud.  From 1989 to 1991, Frankel and his associates caused dozens of investors to invest millions of dollars in Creative Partners.  There was no evidence presented at trial that any monies Frankel obtained from Creative Partners investors were commingled into SCS Account #70023 or SCS Account #70026.  Testimony at trial established that Frankel always kept Creative Partners' money segregated and in separate bank accounts.  Since this proceeding began in 1999, no Creative Partners investor has ever come forward claiming to have an interest in any funds contained in SCS Account #70026.

Between January 1, 1992 and January 19, 1999, Frankel made approximately 100 additional deposits of looted Insurance Company funds into SCS Account #70026.

Those deposits of Insurance Company funds into SCS Account #70026 were typically made from Frankel's brokerage accounts at Dreyfus, which he used as holding accounts to park looted Insurance Company funds before he transferred them to SCS Account #70026. Frankel used the Dreyfus accounts solely to store looted Insurance Company funds. There was no evidence that any non-Insurance Company funds were ever deposited into the Dreyfus accounts.

From January 1, 1992 until January 19, 1999, the total amount of looted Insurance Company funds deposited into SCS Account #70026 was approximately $338 million.

Of that $338 million in looted Insurance Company funds, approximately $76 million was deposited into SCS Account #70026 in the three months immediately preceding the purchase of the Defendant Property.

From January 1, 1992 until the purchase of the Defendant Property in January 1999, there were only six deposits into SCS Account #70026 that cannot be definitively traced to looted Insurance Company funds. The aggregate value of these six deposits is approximately $11,000. The last of these deposits

occurred in July 1998.  There is no evidence that any other party has stepped forward and asserted a claim to that $11,000.

Therefore, the total amount of funds deposited into SCS Account #70026 from its inception until January 19, 1999 was approximately $346,311,000, at least 99.6% of which was looted Insurance Company funds.  This percentage calculation is based on the deposits identified above and assumes that the $1.5 million in unaccounted for funds deposited into Account #70023 made their way into Account #70026.  It also assumes that the six deposits of unknown origin totaling $11,000 were non-Insurance Company funds.

No person, apart from Frankel and the entities under his control, ever deposited money into SCS Account #70026.  Apart from the Receiver-Claimants, there is no evidence that any person or entity has ever asserted any interest, ownership or otherwise, in the funds contained in SCS Account #70026 in any other Frankel-related forfeiture action.

In November 1998, Sundew, acting under the direction and control of Frankel, executed an agreement to purchase the Defendant Property.  Sundew retained the Law Offices of Effron & Durkin, P.C. ("Effron & Durkin") to represent it in this real estate transaction.

On December 15, 1998, Frankel instructed Banque SCS Alliance to transfer $257,515.00 from SCS Account #70026 to

Effron & Durkin account number 586-1-508728 at Chase Manhattan Bank.  On December 16, 1998, Effron & Durkin issued check number 2069 from its IOLTA account number 586-1-508728 at Chase Manhattan Bank in the amount of $257,500.00 to the order of Ramer & Ramer, as Trustee, representing a ten percent deposit for the purchase of the Defendant Property.  On January 18, 1999, Frankel instructed Banque SCS Alliance to transfer the amount of $2,331,643.14, representing the balance of the purchase price, from SCS Account #70026 to Effron & Durkin IOLTA account number 586-1-508728, at Chase Manhattan Bank.  On January 19, 1999, ownership of the Defendant Property was conveyed to Sundew from Charles E. Davidson and Theresa Davidson by warranty deed for the purchase price of $2,575,000.00.  On January 21, 1999, Effron & Durkin issued check number 2143 from its IOLTA account number 586-1-508728, at Chase Manhattan Bank, made payable to Ramer & Ramer, Escrow Account, in the amount of $2,317,064.43, as payment of the remaining balance of the purchase price for the Defendant Property.  Sundew was the record owner of the Defendant Property pursuant to a warranty deed dated January 19, 1999 and recorded January 21, 1999 at Volume 3213, Page 327 of the Greenwich Land Records.

B.  The Arrest and Interlocutory Sale of the Defendant
Property

On September 9, 1999, the Government instituted this action
by filing a Verified Complaint of Forfeiture seeking to enforce
the provision of 18 U.S.C. Section 981(a)(1)(A) for the
forfeiture of real property involved in a financial transaction
in violation of 18 U.S.C. §§ 1956 and 1957.

On September 10, 1999, the Court issued a Warrant of Arrest
*in rem* for the Defendant Property after being satisfied that
based on the Verified Complaint of Forfeiture and pursuant to
United States v. James Daniel Good Real Property, 510 U.S. 43,
62 (1993), the Government had established that there were
exigent circumstances to justify the issuance of a warrant of
arrest *in rem* without a pre-seizure hearing.

On October 23, 2002, the Court ordered the interlocutory
sale of the Defendant Property pursuant to Rule E(9)(b) of the
Supplemental Rules for Certain Admiralty and Maritime Claims,
United States customs laws, the Tariff Act of 1930, 19 U.S.C. §
1612(a) (incorporated by 18 U.S.C. § 981(d)) and 28 U.S.C. §
2004, which provide authority and procedures for the
interlocutory sale of real property pending forfeiture, after a
showing that the property was "liable to perish, or to waste or
to be greatly reduced in value by keeping, or that the expense

of keeping the same is disproportionate to the value thereof."
19 U.S.C. § 1612(a).

On January 23, 2003, the Defendant Property was sold at
public auction for $2,350,000.00.  Hereinafter, the
$2,350,000.00 proceeds from the sale of the Defendant Property
will be referred to as the "*res*."  On March 5, 2003, the Court
approved the interlocutory sale.

III.  The Claimants

    A.  The Receiver-Claimants

In May 1999, courts in the states where the Insurance
Companies were domiciled appointed the Receiver-Claimants to
oversee the assets, operations, liquidations and winding up of
the Insurance Companies.  None of the Receiver-Claimants had
been officers or directors of, or associated in any legal
capacity with, the Insurance Companies and did not know of
Frankel's fraudulent scheme.

The Government and the Receiver-Claimants stipulated that
the Insurance Companies had no knowledge of Frankel's purchase
of the Defendant Property.  There is no evidence to the contrary
in the record before the Court.

Pursuant to court orders issued in each of the Insurance
Companies' domiciliary states and the relevant statutory
authority under which they operate, the Receiver-Claimants are
vested with title to all existing assets of the Insurance

12

Companies wherever located, including any equitable interests they may have.  Insurance receivership statutes in those states authorize the Receiver-Claimants to deal with the property, business and affairs of the Insurance Companies and to intervene in such matters as necessary for the collection and recovery of the property and interests of the Insurance Companies.

The Receiver-Claimants are Mike Chaney, Commissioner of Insurance for the State of Mississippi, in his official capacity as Receiver of FPL, FGL and FNL; Leslie A. Newman, Commissioner of Commerce and Insurance for the State of Tennessee, in her official capacity as Receiver of FAL; John M. Huff, Director of the Department of Insurance, Financial Institutions and Professional Registration for the State of Missouri, in his official capacity as Receiver of IFS; Kim Holland, Insurance Commissioner for the State of Oklahoma, in her official capacity as Receiver of FRL; and Jay Bradford, Insurance Commissioner for the State of Arkansas, in his official capacity as Receiver for OSL.

The Receiver-Claimants filed, on various dates beginning on February 15, 2000, claims and counterclaims in this action against the Government asserting ownership of the Defendant Property because of their allegations that the Defendant Property was purchased with funds looted from the Insurance Companies.  The Receiver-Claimants also filed a Joint Cross-

13

Claim against Lacoff on February 11, 2005 seeking a declaratory judgment that they have full and unencumbered title to and interest in, and sole right to possess, the Defendant Property, and that Lacoff has no title to or interest in, or right to possess, the Defendant Property.

The Government stipulated that the Receiver-Claimants are innocent owners of the Defendant Property pursuant to 18 U.S.C. § 981(a)(2).

At trial, Lacoff introduced into evidence a report by the United States Government Accountability Office ("GAO") which concluded that in many cases the victimized Insurance Companies failed to follow proper oversight and compliance practices.

In addition to lodging claims in this forfeiture action, on April 11, 2006, pursuant to 18 U.S.C. § 981 and 28 C.F.R. § 9.1 et seq., the Receiver-Claimants filed a petition for remission with the United States Department of Justice ("DOJ").  The petition sought remission of all property then subject to forfeiture proceedings that Frankel acquired with looted Insurance Company funds, including the Defendant Property.

Thereafter, the FBI, the IRS, the United States Attorney for the District of Connecticut and the DOJ investigated and evaluated the Receiver-Claimants' petition for remission.  These entities determined, pursuant to 28 C.F.R. § 9.5, that the Receiver-Claimants were justly entitled to the Defendant

14

Property and that the Insurance Companies did not knowingly
contribute to, participate in, benefit from or act in a
willfully blind manner towards the commission of the offenses
underlying the forfeiture.

On April 18, 2007, the DOJ issued an administrative ruling
granting the Receiver-Claimants' petition for remission, which
included a determination regarding the Defendant Property.
Pursuant to that ruling, should the Government succeed in this
forfeiture action, the *res* would be remitted to the Receiver-
Claimants.  At that point the funds would be distributed amongst
the various Receiver-Claimants pursuant to a schedule they
established and set forth in their petition for remission.

B.  Lacoff

Lacoff is the owner of 881 Lake Avenue, Greenwich,
Connecticut ("881 Lake Avenue") and has owned that property
since 1977.  881 Lake Avenue is a neighboring property to the
Defendant Property.

Pursuant to a written agreement, Lacoff leased 881 Lake
Avenue to Sundew for a term beginning on February 1, 1995 and
ending on April 30, 1996 after meeting with Frankel and finding
him trustworthy.  The monthly rent was $15,000.  A lawyer for
Sundew and Sundew's vice-president, David Rosse ("Rosse"),
signed the lease agreement.  Rosse additionally executed a
guaranty for Sundew's performance of the lease agreement on

15

January 30, 1995.  Rosse placed $67,500 in escrow to be released
in the event he defaulted on his obligations under the guaranty.
The lease agreement provided, *inter alia*, for liquidated damages
of $500 per day following a breach of the agreement if Sundew
vacated the property and Lacoff was unable to re-rent the
property.  These liquidated damages would accrue for the later
of sixty days or the expiration of the lease.  On April 29,
1996, Sundew and Lacoff agreed to modify the lease agreement to
extend the term to April 30, 2001.

Approximately three or four months after executing the
April 29, 1996 lease extension, Sundew stopped paying rent in
full to Lacoff.

By early 1997, Lacoff commenced an eviction action against
Sundew because of the unpaid rent and fears about events
transpiring at 881 Lake Avenue.  Lacoff subsequently signed an
agreement dated October 31, 1997 with Sundew pursuant to which
Sundew would return possession of 881 Lake Avenue to Lacoff and
Lacoff would release Sundew from liability under the lease
agreement (the "Settlement Agreement").  Both Lacoff and Sundew
had counsel in negotiating this Settlement Agreement.  In
December 1997, Lacoff retook possession of 881 Lake Avenue and
it became her residence at all times thereafter.  She did not
re-rent the premises.

16

At trial, divergent accounts of damage Frankel and his cohorts allegedly inflicted on 881 Lake Avenue were presented. Sundew's attorney testified that Sundew had inflicted minor damage on the property, while Lacoff testified that the damage was catastrophic.  No party offered photographic evidence of the purported damage to 881 Lake Avenue at trial and the physical damage calculations were supported only by repair estimates.

After executing the Settlement Agreement and moving back into her home, Lacoff took no further legal action against Frankel or Sundew until May or June 1999, when she came to believe that Frankel had fled the United States.  Then, on or about June 14, 1999, she commenced an action in the Housing Session of the Connecticut Superior Court at Norwalk, Connecticut seeking damages and related relief arising out of Sundew's breach of the lease agreement and for property damage. At the time she commenced that action, Lacoff filed an application for a prejudgment remedy pursuant to Connecticut law.  The prejudgment remedy was granted on June 15, 1999 and provided for a writ of attachment on the Defendant Property in the amount of $2,000,000.00.  In connection with her application for a prejudgment remedy, Lacoff represented to the Superior Court that "[u]pon information and belief, Defendant Sundew has no defenses, counterclaims or set-offs to LACOFF'S claims."  She

made this representation despite the existence of the Settlement Agreement.

At an *ex parte* damages hearing held on August 5, 1999, Lacoff's husband testified that Frankel caused approximately $726,000 in damage to 881 Lake Avenue.  He also testified that Sundew owed the Lacoffs approximately $910,000 for future rent from November 1997 through April 2001.

Sundew did not appear or defend the action and, on August 5, 1999, the Superior Court entered judgment in Lacoff's favor in the amount of $2,084,350.03 plus $543.00 in fees and costs, a sum inclusive of the claimed property damage and lost future rent.

On or about August 6, 1999, Lacoff secured her judgment against Sundew by filing and recording a judgment lien against the Defendant Property that, by virtue of her prejudgment attachment, related back to June 15, 1999.

On June 30, 1999, Lacoff and her husband commenced an action in federal court against Fireman's Fund Insurance Company ("Fireman's Fund") seeking payment of her insurance claim for the damages Sundew allegedly caused to 881 Lake Avenue.  In the complaint against Fireman's Fund, the Lacoffs pleaded the existence and validity of the Settlement Agreement.  During his July 1998 deposition in the Fireman's Fund litigation, Lacoff's husband (who had served as Lacoff's agent during the settlement

18

negotiations with Sundew) testified that he and Lacoff had "released" Sundew from liability under the lease agreement.  The Lacoffs eventually settled the federal court action and received payment from Fireman's Fund in the amount of $480,000.00 to resolve the claim.[2]

On September 22, 1999, Lacoff filed a claim in this forfeiture proceeding alleging an interest in the Defendant Property arising from her judgment lien.  On October 4, 1999, Lacoff filed a verified answer and affirmative defenses to the Government's *in rem* forfeiture complaint.  As previously noted, the Receiver-Claimants filed a Joint Cross-Claim against Lacoff on February 11, 2005 seeking a declaratory judgment that they have full and unencumbered title to and interest in, and sole right to possess, the Defendant Property, and that Lacoff has no title to or interest in, or right to possess, the Defendant Property.  On September 21, 2005, Lacoff filed an answer and affirmative defenses to the Receiver-Claimants' cross-claim, which she amended on February 21, 2006.

Lacoff testified in this case that when she commenced her June 1999 Superior Court action against Sundew, she had no knowledge that Frankel or Sundew were engaged in criminal activity.  Lacoff further testified that, as of the date of her

---

[2] The Lacoffs actually received a net amount of $324,000 after subtracting attorneys' fees and fees paid to a public adjuster.

trial testimony on September 24, 2009, she still had no knowledge as to whether or not the Defendant Property was purchased using funds obtained from Frankel's criminal activity. As of that same date, Lacoff testified that she had no knowledge as to whether or not the Defendant Property was associated with illegal transactions. Lacoff testified that at all times she had, at most, suspicions of Frankel's activities. This is despite signing an affidavit in June 1999 that she filed with her Superior Court pleadings that stated that "Upon information and belief, SUNDEW is one of the business entities used by Frankel and/or Rosse in his/their scheme to divert approximately $3 billion in assets from the insurance companies and charities to various accounts."

## CONCLUSIONS OF LAW

This action was brought pursuant to 18 U.S.C. § 981,[3] which provides in pertinent part for the civil forfeiture of:

> Any property, real or personal, involved in
> a transaction or attempted transaction in
> violation of section . . . 1956 or 1957 of
> this title, or any property traceable to
> such property.

18 U.S.C. § 981(a)(1)(A). To seize property under this section, the Government must demonstrate probable cause to believe that

---

[3] This litigation is governed by the civil forfeiture laws in place at the time of filing, not the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"). United States v. $557,933.89, 287 F.3d 66, 76 n.5 (2d Cir. 2002) (holding that CAFRA does not apply retroactively to forfeiture claims, such as this one, that were filed before August 23, 2000).

the property is subject to forfeiture.  United States v. Funds
Held ex rel. Wetterer, 210 F.3d 96, 103 (2d Cir. 2000).  In this
case, probable cause requires a showing that the seized funds
were "involved in a transaction or attempted transaction in
violation of" the money laundering statutes, Section 1956 and
1957.  See 18 U.S.C. § 981(a)(1)(A).  Section 1956 prohibits:

> A financial transaction which in fact
> involves the proceeds of specified unlawful
> activity . . . with the intent to promote
> the carrying on of specified unlawful
> activity. . . .

18 U.S.C. § 1956(a)(1).  Section 1957 prohibits:

> a monetary transaction in criminally derived
> property that is of a value greater than $
> 10,000 and is derived from specified
> unlawful activity . . . .

18 U.S.C. § 1957(a).

The Second Circuit has held that the Government's burden is
"to show a nexus between the illegal conduct and the seized
property."  Marine Midland Bank, N.A. v. United States, 11 F.3d
1119, 1126 (2d Cir. 1993).  Once the Government establishes
probable cause, forfeiture of the defendant property is proper.
United States v. $557,933.89, 287 F.3d at 76-77.  The burden of
proof then shifts to any third-party claimant "to show by a
preponderance of the evidence (1) that the defendant property
was not in fact used unlawfully, or (2) that the predicate
illegal activity was 'committed without the knowledge' of the

owner-claimant, 18 U.S.C. § 981(a)(2), that is, that the claimant is an 'innocent owner.'" <u>Wetterer</u>, 210 F.3d at 104 (internal quotations and citations omitted).  Pursuant to the pre-CAFRA version of 18 U.S.C. § 981(a)(2), "[n]o property shall be forfeited under [§ 981] to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder."  "The so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant." <u>United States v. 755 Forest Road</u>, 985 F.2d 70, 72 (2d Cir. 1993).

In this case, neither the Receiver-Claimants nor Lacoff dispute that the Defendant Property was involved in a transaction or attempted transaction that violated the relevant statutes.  Instead, they both seek to defeat the forfeiture pursuant to innocent owner claims.

The Court notes that despite the somewhat confusing and conflicting assertions, the lengthy nature of the proceedings and the animosity between the claimants, "[i]t must be remembered that what is adjudicated in a judicial civil forfeiture proceeding is the government's right to the property, not the claimant's." <u>United States v. $557,933.89</u>, 287 F.3d at 77.

I.  The Defendant Property is Subject to Forfeiture

     As stated, the first step in a pre-CAFRA *in rem* civil
forfeiture case is for the Government to establish probable
cause to forfeit the Defendant Property.

     The evidence at trial demonstrated that "a nexus exists
between the seized property and the predicate illegal activity"—
namely the fact that the Defendant Property was purchased either
exclusively or predominantly with looted Insurance Company funds
traceable to Frankel's criminal activities.  Wetterer, 210 F.3d
at 104.

     Consequently, the Court concludes that the Government has
met its burden and that the Defendant Property is subject to
forfeiture pursuant to § 981(a)(1)(A) because it was involved in
financial transactions that violated 18 U.S.C. §§ 1956 and 1957.

     Consequently, unless one of the claimants can defeat the
forfeiture by a preponderance of the evidence by establishing
that it is an innocent owner, the Defendant Property will be
forfeited to the Government.

II.  The Innocent Owner Claims

     Because the Government has satisfied the first prong of the
Wetterer test by establishing probable cause for the forfeiture
of the Defendant Property, the Court must next focus on the
second prong of the Wetterer test.  Thus, the Court must

determine whether one or both of the claimants has established that it is an innocent owner of the Defendant Property.

The Receiver-Claimants and Lacoff assert entirely different legal and equitable theories to defeat the forfeiture. The Receiver-Claimants seek the imposition of a constructive trust over the Defendant Property on the grounds that it was purchased with looted Insurance Company funds.  Lacoff seeks the *res* pursuant to her Superior Court judgment lien on the Defendant Property.

There are two approaches available to the Court in adjudicating which, if either, of the claimants is entitled to the *res*.  The Court can first analyze each claimant's status as an innocent owner and then, if both are determined to be innocent owners, evaluate which claim should have priority over the *res*.  Alternatively, the Court can evaluate the respective claims of the Receiver-Claimants and Lacoff and determine which claim has a higher legal priority to the *res* and then, after determining which claim has a higher priority, evaluate whether that claimant is an innocent owner.

In the interest of judicial economy, the Court will follow the second approach.  The reason for this is simple.  Both the Receiver-Claimants and Lacoff seek the entire *res*.  Thus, the successful claim of either claimant will not only defeat the Government's forfeiture of the Defendant Property, but will also

24

dispose of the entire *res* and, in doing so, will deny the other claimant the possibility of any recovery.  Consequently, the Court need not determine whether the claimant that is denied the *res* is an innocent owner because even if it is, there would be nothing left of the *res* to distribute.  In other words, if the Receiver-Claimants are entitled to a constructive trust that has priority over Lacoff's judgment lien and demonstrate that they are innocent owners, they shall receive the entirety of the *res*. In that case, the merits of Lacoff's claim and her status as an innocent owner would be irrelevant because no portion of the *res* would be left to disburse to her.

A.  The Receiver-Claimants' Constructive Trust

1.  Constructive Trusts Under Connecticut Law

As noted, the Receiver-Claimants assert that they are innocent owners of the Defendant Property because Sundew purchased the Defendant Property using looted Insurance Company funds.  The Receiver-Claimants argue that because the Defendant Property was purchased using looted Insurance Company funds, they are entitled to the judicial imposition of a constructive trust over the Defendant Property.

The Court notes that each Receiver-Claimant has decided that it wishes to proceed collectively in seeking the imposition of a constructive trust over the Defendant Property.[4]

Whether a constructive trust is appropriate under the circumstances of this case is determined under Connecticut law. This is because federal courts look to state law to determine whether a party has an equitable interest in property for purposes of satisfying the innocent owner standard.  See Torres v. $36,256.80 in U.S. Currency, 25 F.3d 1154, 1158 (2d Cir. 1994) (applying New York law to determine the applicability of a constructive trust in a forfeiture proceeding), and because federal common law choice-of-law rules require application of the law of the jurisdiction having the greatest interest in the litigation in federal question litigation like this forfeiture proceeding.  See In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir. 1992).

Connecticut has the greatest interest in whether the Receiver-Claimants have an equitable interest in the Defendant Property because: (1) the Defendant Property is located in Connecticut; (2) Frankel perpetrated his illegal scheme from Connecticut; (3) the Defendant Property was seized in

---

[4] The Receiver-Claimants have already stipulated among themselves as to the manner by which any property they recover will be distributed.  According to their stipulation, as modified, OSL and its receiver, Jay Bradford, will be excluded from any recovery in this action because Frankel's looting of that insurance company occurred after the purchase of the Defendant Property.

Connecticut; and (4) the looted funds were spent in Connecticut to purchase the Defendant Property.

With regard to constructive trusts, the Connecticut Supreme Court has explained that "[a] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."  <u>Town of New Hartford v. Conn. Res. Recovery Auth.</u>, 291 Conn. 433, 466 (Conn. 2009) (citations and internal quotations omitted).  In sum, "a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it."  <u>Id</u>.  Further, under Connecticut law, "[a] claimant entitled to restitution from property may obtain restitution from any traceable product of that property, without regard to subsequent changes of form."  <u>Id</u>.

> 2.  The Receiver-Claimants' Are Entitled to the
> Imposition of a Constructive Trust Over the Defendant
> Property

In <u>Beatty v. Guggenheim Exploration Co.</u>, 225 N.Y. 380, 386, 122 N.E. 378 (1919), Judge Cardozo wrote: "A constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such

circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." That spirit animates the Court's decision to impose a constructive trust on behalf of the Receiver-Claimants here.

As explained above, under Connecticut law a "constructive trust arises contrary to intention and *in invitum*, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113 (Conn. 1996) (internal quotations omitted). That scenario occurred when Frankel looted the Insurance Companies and used that fraudulently obtained money to purchase the Defendant Property via his control of Sundew.

The Connecticut Supreme Court made clear in Wendell that under state law, "[t]he determination that a constructive trust could be imposed . . . is, in a sense, the beginning of the inquiry, not the end." Id. at 120. By this, that court meant that once a court recognizes that a party is eligible for a constructive trust, the question then becomes whether this

equitable remedy ought to be imposed.  As that court stated, "[t]he trial court may recognize the existence of the constructive trust and, nevertheless, decline to order the conveyance or other disposition of the property in satisfaction of the debt." Id.  In clarifying that statement, that court particularly pointed to a situation where the aggrieved party had an adequate remedy at law as a situation where a proceeding in equity cannot be maintained.

Moreover, the Second Circuit has made it clear that "[t]he beneficiary of a constructive trust does not have an interest superior to the trustee's in every asset the trustee holds, but only in those assets held in constructive trust or traceable to such assets." United States v. Schwimmer, 968 F.2d 1570, 1583 (2d Cir. 1992).  And "[i]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." United States v. Benitez, 779 F.2d 135, 140 (2d Cir. 1985).  Consequently, an entity who wishes to have a constructive trust established on its behalf must be able to trace its funds to the property over which the trust will be established.

As noted, the Receiver-Claimants established at trial that, at a minimum, 99.6% of all monies deposited into SCS Account #70026 were definitively traceable to looted Insurance Company

29

funds and that all deposits of funds into SCS Account #70026 in the months immediately preceding Sundew's purchase of the Defendant Property consisted solely of looted Insurance Company funds.

Because the Defendant Property was purchased with funds looted from the Insurance Companies, the Receiver-Claimants are *entitled* to the imposition of a constructive trust.  The decision *to* impose a constructive trust is in the discretion of the Court.  Wendell, 239 Conn. at 120.

The imposition of a constructive trust is appropriate because the Defendant Property is a converted form of funds looted from the Insurance Companies and because this relief would partially remedy the fact that Frankel looted the Insurance Companies to the point of insolvency, injuring both the Insurance Companies and their policy holders.  The result of imposing a constructive trust over the Defendant Property on behalf of the Receiver-Claimants is a recognition that upon tender of the purchase price for the Defendant Property, Sundew took title as trustee for the Insurance Companies.[5]

The Court imposes a constructive trust on the Defendant Property on behalf of the Receiver-Claimants despite Lacoff's arguments that to do so would be inappropriate.  Lacoff proffers

---

[5] Thus, as discussed *infra*, Sundew was a mere trustee on behalf of the Insurance Companies at the time Lacoff's judgment lien attached to the Defendant Property.

three arguments[6] as to why the law precludes the imposition of a
constructive trust in favor of the Receiver-Claimants.[7]  First,

---

[6] At trial, counsel for Lacoff also seemed to contest the tracing of the funds
used to purchase the Defendant Property, suggesting that other funds may have
been used for that purpose.  However, Lacoff only contests this forfeiture
under the second prong of Wetterer, namely that she meets the statutory
definition of an innocent owner of the Defendant Property.  210 F.3d at 104.
Notably, Lacoff does not challenge the forfeiture of the Defendant Property
under the first prong of Wetterer, i.e., she does not allege that the
Defendant Property was not used unlawfully.  Id.  Indeed, Lacoff denies any
knowledge of Frankel's criminal activities or regarding the involvement of
the Defendant Property in any criminal activities.  In the absence of that
knowledge, Lacoff could not allege that the Defendant Property was not
involved in a money-laundering transaction.  Consequently, if Lacoff truly
believed that the Defendant Property was not purchased with looted Insurance
Company funds—and was instead purchased with "Creative Partners" funds, for
example—she should have challenged the forfeiture of the Defendant Property
as not being involved in a money laundering transaction—the first prong of
Wetterer.  Because she did not do so—and could not do so because she claims
to have lacked the requisite knowledge of Frankel's crimes—the challenges she
raises in connection with the Receiver-Claimants' tracing of the funds used
to purchase the Defendant Property must be interpreted as a challenge only to
the sufficiency of their evidence, not as an attempt to establish facts
regarding the purchase of the Defendant Property.

[7] The proper procedural mechanism by which multiple claimants in a forfeiture
proceeding challenge each other's right to the forfeited property is via
cross claims.  See United States v. All Right, Title & Interest in Accounts
at Morgan Guar. Trust Co., No. 95 CIV. 10929 HB THK, 1996 U.S. Dist. LEXIS
17987 (S.D.N.Y. Dec. 5, 1996) (discussing that cross-claims between
forfeiture claimants may be brought); see also United States v. $557,933.89,
287 F.3d at 78 n.8 (noting that in a civil forfeiture matter, a "jury may be
properly asked to adjudicate cross-claims among multiple claimants, each with
colorable but to some extent competing claims of interest in the defendant
property[,]" suggesting that the vehicle for different claimants to challenge
each other's claims of interest is via cross-claims, not the underlying
forfeiture action).  The Receiver-Claimants filed a cross-claim in this
litigation against Lacoff seeking declaratory relief regarding their
ownership of the Defendant Property and her lack of an ownership interest.
Lacoff answered this cross-claim and pleaded affirmative defenses thereto,
but did not bring any cross-claims of her own.  Nevertheless, though the
Receiver-Claimants' cross-claim against Lacoff was procedurally proper, it is
moot.  Because, as noted, the resolution of the forfeiture action will
dispose of the entirety of the res, a declaration of the rights of possession
of the Receiver-Claimants pursuant to a cross-claim is superfluous.
Assuming, arguendo, that the Defendant Property is forfeited because the
Government establishes probable cause for the forfeiture and neither claimant
successfully defeats the forfeiture, the Receiver-Claimants would not be
entitled to the declaration they seek.  Conversely, if the Defendant Property
is not forfeited because the Receiver-Claimants are the prevailing innocent
owners, the declaration they seek would be redundant.  If the Defendant
Property is not forfeited, but Lacoff is the prevailing innocent owner, the
Receiver-Claimants would obviously not be entitled to the declaration they

she claims that the imposition of a constructive trust, an equitable remedy, is inappropriate in a case such as this where a legal remedy—namely remission—exists.  Second, she claims that the Receiver-Claimants may not pool their claims to establish a constructive trust, but instead that each receiver must prove its pro rata ownership of the Defendant Property.  Third, Lacoff argues that the imposition of a constructive trust is inappropriate when used to defeat her claim.  None of these arguments is availing.

> a.   There is No Legal Remedy That Precludes the
>      Imposition of a Constructive Trust

Because a constructive trust is an equitable remedy, its application is only appropriate when there is no available adequate legal remedy.  Wendell Corp., 239 Conn. at 120-21. Lacoff's claim that the Receiver-Claimants right to petition the DOJ for remission is an adequate available legal remedy that denies them the opportunity to seek an equitable remedy is incorrect.

Remission is only an adequate remedy at law if there is forfeited property to be disbursed.  If a civil forfeiture is defeated, there is no property to forfeit.  See Schwimmer, 968

---

seek.  Consequently, there is no scenario where the Receiver-Claimants cross-claim is relevant.  Because the Receiver-Claimants' cross-claim is moot, Lacoff's affirmative defenses—which were only raised in connection with that cross-claim—are moot.  To the extent that Lacoff's affirmative defenses are not moot, her failure to pursue them at trial renders them abandoned.

F.2d at 1577 ("Thus, the authority of the United States to dispose of property ordered forfeited to it [i.e., via remission] is contingent upon the Government's right to that property surviving any third-party challenge . . .").  Hence, if either the Receiver-Claimants or Lacoff is held to be an innocent owner of the Defendant Property, there would be no property to be forfeited and, consequently, no funds from the *res* to be remitted.

Indeed, the DOJ's ruling granting the Receiver-Claimants' petition for remission makes it clear that the Receiver-Claimants are only entitled to remission if the United States succeeds in forfeiting the property.  See 18 U.S.C. § 981(e) (noting that the Attorney General may remit property "forfeited pursuant to this section"); 28 C.F.R. § 8.10 (same).

Thus, if either the Receiver-Claimants or Lacoff defeats the forfeiture, there would be no remaining *res* to be remitted.  The Second Circuit cases on which Lacoff relies to support her argument that a constructive trust should not be imposed over the Defendant Property because of the Receiver-Claimants' right of remission are inapposite.

Lacoff's reliance on United States v. Ribadeneira, 920 F. Supp. 553 (S.D.N.Y. 1996), aff'd (per curiam), 105 F.3d 833 (2d Cir. 1997), in support of this argument is unavailing because in that case, unlike this one, the parties seeking relief were

general creditors who lacked a specific interest in the funds
subject to forfeiture.   Specifically, in Ribadeneira the
claimants sought the recovery of funds involved in a money
laundering scheme at a defunct exchange house.  Id.   The
Government argued that the petitioners were general creditors
lacking a specific legal interest in the seized funds.  Id.   The
court agreed, noting that "[d]ollars are fungible" and that
"[a]s holders of checks, as opposed to security interests,
petitioners are unable to assert rights to a particular asset or
specified funds."  Id. at 555.

In addition to directly asserting claims to the seized
funds, the petitioners in Ribadeneira argued that the court
should impose a constructive trust on the funds naming them as
beneficiaries.  Id. at 555-56.   The district court declined to
do so because they were general creditors.  Id.   Additionally,
the court held that a constructive trust was inappropriate
because the petitioners could seek remission from the Attorney
General for statutory relief.  Id. at 556.   The district court
held that this—a petition for remission—was the proper result
for "those, like petitioners, with general claims against the
estate, but without secured rights in specific identified
property."  Id.

The Second Circuit affirmed the district court's decision
in Ribadeneira.   United States v. Ribadeneira, 105 F.3d 833 (2d

Cir. 1997).  Significantly, the court noted that "an interest
'in' property must be an interest in a particular, specific
asset, as opposed to a general interest in an entire forfeited
estate or account."  Id. at 836.  In other words, the
petitioners needed to be more than mere general creditors.  Id.

The Second Circuit also gave two reasons why the district
court's decision not to impose a constructive trust was
appropriate: the petitioners had failed to make a valid claim
for the imposition of a constructive trust under New York law
and the remission procedure was an adequate legal remedy for
those general creditors.  Id. at 837 n.5.

Lacoff also mistakenly relies on United States v. Khan, No.
97-6083, 1997 U.S. App. LEXIS 31870 (2d Cir. Nov. 10, 1997).
There, the district court dismissed third-party claimant
creditors and precluded them from contesting an in rem civil
forfeiture of bank accounts because the claimants, like those in
Ribadeneira and unlike those here, were a group of general, not
specific, creditors, of a bank account, not specific property.
Id. at *5-7.  And in Khan, like in Ribadeneira, but unlike in
this case, the petitioners failed to demonstrate that they were
entitled to a constructive trust under New York law.  Id. at *7.

In sum, all three of the cases on which Lacoff relies are
distinguishable from this case for the same reasons, namely
because the Receiver-Claimants (1) are not general creditors to

a bank account, but instead are claimants to specific property via adequate tracing of funds[8], and (2) need not be restricted to only seeking relief via statutory remission because they have adequately met the test for the imposition of a constructive trust under Connecticut law.[9]

> b.  The Receiver-Claimants May Pool their
>
>     Separate Claims

There is also no merit to Lacoff's assertion that the Receiver-Claimants may not collectively seek the imposition of a constructive trust, but that each Receiver-Claimant must trace the funds of his respective insurance company to the purchase of the Defendant Property and then seek separate constructive trusts on the basis of that tracing.

Lacoff mistakenly relies on Schwimmer, 968 F.2d 1570, for this argument.  The Second Circuit in Schwimmer criticized the

---

[8] This conclusion is in line with the decision of the Second Circuit relating to another Frankel forfeiture that had also been before this Court.  In United States v. Peoples Benefit Life Ins. Co., 271 F.3d 411, 416 (2d Cir. 2001), the Second Circuit noted that the ability to trace the property subject to forfeiture was a crucial component for the proper imposition of a constructive trust.  Id. at 416.  In Peoples, the proposed intervenors could not trace the property they sought via the forfeiture proceedings, so the appellate court affirmed this Court's decision not to permit intervention. Id.

[9] The same reasoning was utilized in United States v. $ 79,000 in Account No. 2168050/6749900 at the Bank of N.Y., No. 96-Civ.-3493 (MBM), 1996 U.S. Dist. LEXIS 16536 (S.D.N.Y. Nov. 6, 1996), where the claimants failed to allege a sufficient property interest to make them anything more than general creditors.  Because they were general creditors, the court held that "[a]lthough claimants have not alleged the ownership interest required to contest the forfeiture judicially, they have alleged a sufficient interest in the property to apply for remission or mitigation of the forfeiture."  Id. at *19.

district court for pooling the claims of various unions in considering whether to impose a constructive trust over two of the defendants' assets (which the court also pooled).  Lacoff construes this criticism as a blanket prohibition on "pooling" claims.  This takes <u>Schwimmer</u> too far; the court did not hold that collective "pooling" was *per se* improper.  <u>Id</u>. at 1584.

The Receiver-Claimants have proven by a preponderance of the evidence that at least 99.6% of the funds in SCS Account #70026 were from the looted Insurance Companies.  No other entity—including Lacoff—has claimed that its funds were used to purchase the Defendant Property or that the Receiver-Claimants have erred in tracing the looted funds.[10]  Consequently, the only entities that could be harmed by the collective imposition of a constructive trust are the various individual Receiver-Claimants.  Because they have already stipulated to how any recovered looted funds will be disbursed, the imposition of a collective constructive trust is permissible.

---

[10] Lacoff's assertion that the Receiver-Claimants have acted somehow disingenuously in failing to trace the funds of all of Frankel's victims to determine whose funds comprise the specific dollars in SCS Account #70026 that they cannot trace is irrelevant.  The Receiver-Claimants are not charged by the courts in their respective states with the responsibility for unraveling all of Frankel's crimes, just to recover looted Insurance Company funds.  Any other potential claimant could have lodged a claim to the Defendant Property; none did.  The Court need not worry that, through their tracing exercises, the Receiver-Claimants have somehow wronged a potential, but unidentified, entity who has never presented itself as a claimant to the Defendant Property.

c.  The Claimants Are Not In Competition for the
*Res* Such that One Would Be Unjustly Enriched Vis-
à-vis the Others

Finally, there is no merit to Lacoff's assertion that there
is no unjust enrichment in this case warranting the imposition
of a constructive trust on behalf of the Receiver-Claimants and
that imposing this equitable remedy would harm another aggrieved
party.  Lacoff's first argument is that a constructive trust is
inappropriate because Frankel disclaimed ownership of the
Defendant Property in his criminal case.  Her second argument is
that the imposition of a constructive trust is inappropriate to
benefit one claimant, i.e., the Receiver-Claimants, at the
expense of another claimant, i.e., herself.

First, Lacoff's argument that Frankel has disclaimed
ownership over the Defendant Property and therefore would not be
unjustly enriched absent the imposition of a constructive trust
is incorrect.  It has long been the rule in Connecticut that a
constructive trust arises at the moment "when the legal title to
property is obtained by a person in violation, express or
implied, of some duty owed to the one who is equitably entitled,
and when the property thus obtained is held in hostility to his
beneficial rights of ownership."  Van Auken v. Tyrrell, 130
Conn. 289, 291-92 (Conn. 1943) (internal quotations omitted).
Thus, Frankel's unjust enrichment occurred on January 19, 1999,

when he, through Sundew, obtained title to the Defendant Property using looted Insurance Company funds  See Chemical Bank v. Coan, 2 F. App'x 180, 195 (2d Cir. 2001) ("A constructive trust is thought to spring into operation at the time of the events giving rise to the duty to reconvey the property."). The imposition of a constructive trust "is a remedial device designed to prevent unjust enrichment." See Town of New Hartford, 291 Conn. at 466. Consequently, the imposition of a constructive trust at this time is necessary to prevent the unjust enrichment that occurred when Frankel obtained title to the Defendant Property in January 1999.[11]  The fact that Frankel waived his rights in the Defendant Property as part of his plea agreement in his criminal case has no effect on the fact that he wrongfully acquired title to the Defendant Property and as a result was then unjustly enriched.

---

[11] Ironically, if the Court did not impose a constructive trust in favor of the Receiver-Claimants and Lacoff defeated the forfeiture of the Defendant Property, Lacoff would, in effect, *cause* Frankel to be unjustly enriched. Frankel already has been unjustly enriched via his looting of the Insurance Companies. If Frankel is able to satisfy Sundew's debt to Lacoff using the *res*, he will have used wrongfully obtained funds to eliminate a debt he owes. Put another way, as discussed, Sundew is indebted to Lacoff for $2,084,350.03 plus $543.00 in fees and costs as a result of the judgment entered in Lacoff's favor in Superior Court. Lacoff has secured that judgment by a lien on the Defendant Property. In this action, she is seeking to satisfy Frankel's debt out of the *res*. If she were to prevail in this action, Frankel's debt to her would be extinguished with looted Insurance Company funds. Therefore Frankel will have both gotten a benefit from his looting of the Insurance Companies and will have eliminated Sundew's debt. Conversely, if the Receiver-Claimants receive the *res*, the funds Frankel received from the Insurance Companies will be partially returned and Frankel will still be obligated to Lacoff to satisfy her judgment.

Second, Lacoff's argument that she would be harmed by the imposition of a constructive trust on behalf of the Receiver-Claimants belies a fundamental misunderstanding of the legal posture of this case.[12]  The Receiver-Claimants do not seek, and the Court does not impose, a constructive trust *against* Lacoff. The Court imposes a constructive trust on behalf of the Receiver-Claimants.  Lacoff is simply another claimant to the property that is subject to the constructive trust.  Thus, if Lacoff's judgment lien on that property, assuming she was an innocent owner, had priority over the Receiver-Claimants' constructive trust, her claim would defeat the forfeiture.  In

---

[12] The Court is not tasked with balancing the equities of the Receiver-Claimants' claim versus Lacoff's claim and does not engage in such an exercise.  The purpose of this *in rem* forfeiture proceeding is to determine the right of the Government to the Defendant Property, not to determine the opposing claims of the Receiver-Claimants and Lacoff.  See United States v. $557,933.89, 287 F.3d at 77.  Nonetheless, the facts demonstrate that if the Court were to compare the claims, equity would favor the Receiver-Claimants. First, the Insurance Companies, unlike Lacoff, were victims of Frankel's criminal fraud and the Defendant Property was purchased with their looted funds.  Conversely, Lacoff's judgment was the result of Sundew's alleged breach of a lease agreement and damages allegedly inflicted on a different parcel of property—her residence.  Sundew's alleged actions were wrongful, but not criminal.  Second, the judgment Lacoff obtained in the Superior Court was substantially based on lost future rent—$910,000—that was not mitigated by re-renting 881 Lake Avenue.  Further, the property damage component of the Superior Court judgment, approximately $726,000, was based only on repair estimates without any photographic evidence of the alleged damage.  Third, Lacoff has been at least partially compensated for the damage that Sundew allegedly caused to 881 Lake Avenue by virtue of her settlement with her insurance company, Fireman's Fund, from which she collected $480,000.00 ($324,000 when public adjuster and attorneys' fees were subtracted). Finally, the Court is troubled by Lacoff's failure to alert the Superior Court to the existence of the Settlement Agreement during the *ex parte* proceedings.  Conversely, Frankel's fraud left the Insurance Companies insolvent and caused injury to innocent policy-holders.  The only evidence presented at trial impugning the Insurance Company victims of the fraud was a GAO report noting that they might have more closely followed some procedures to prevent fraud.

other words, any constructive trust imposed on the Defendant Property in favor of the Receiver-Claimants has no impact on Lacoff's claim in opposition to the Government's forfeiture of the Defendant Property that is supported by her judgment lien on the property.

B.  Lacoff's Judgment Lien

As noted, Lacoff seeks to defeat the forfeiture of the Defendant Property on the basis of her judgment lien.  She obtained that lien pursuant to Connecticut General Statute § 52-380a, which states that "[a] judgment lien, securing the unpaid amount of any money judgment, including interest and costs, may be placed on any real property . . ."  The judgment lien secured the judgment she obtained against Sundew in the Connecticut Superior Court.  That judgment lien is the sole basis of her ownership claim in this forfeiture proceeding.

C.  A Judgment Lien Is Inferior to a Constructive Trust Under Connecticut Law

The Receiver-Claimants' constructive trust takes priority over Lacoff's judgment lien for two reasons.

First, and most importantly, Lacoff's judgment lien only attached to Sundew's interest in the Defendant Property.  As Connecticut General Statute § 52-380a states, ". . . the money judgment shall be *a lien on the judgment debtor's interest* in the real property described."  (emphasis added).  Because

41

Frankel, through Sundew, acquired the Defendant Property with looted Insurance Property funds and always held the property in trust for the Insurance Companies, he never had an interest in the Defendant Property to which Lacoff's lien could attach.

Second, the Receiver-Claimants' claim was also established first in time.  Their entitlement to a constructive trust arose at the moment Sundew completed the purchase of the Defendant Property on January 19, 1999.  See Van Auken, 130 Conn. at 291-92.  Lacoff's judgment lien related back to June 15, 1999, six months after the Defendant Property was purchased.

The only way that Lacoff's claim could take priority over the Receiver-Claimants' constructive trust would be if she were a bona fide purchaser, but, under Connecticut law, a judgment lienholder is not a bona fide purchaser.  Waterman v. Buckingham, 64 A. 212, 214 (Conn. 1906); see, e.g., Young v. Armetta, No. CV 960079270S, 1999 Conn. Super. LEXIS 1325, at *4-5 (Conn. Super. Ct. May 20, 1999).  Connecticut follows the general common law principal that only a bona fide purchaser has a superior interest to an equitable trust beneficiary (like an entity entitled to a constructive trust).

As the Restatement of the Law of Restitution explains:

> [A] creditor who attaches the property or
> obtains and records a judgment or levies
> execution upon the property is not a bona
> fide purchaser, although he had no notice of
> the constructive trust.

Restatement of the Law of Restitution § 173, comment j.

For the reasons detailed above, the Receiver-Claimants' constructive trust takes priority over Lacoff's judgment lien in this forfeiture proceeding.

D.  The Receiver-Claimants Are Innocent Owners

Having established that a constructive trust is a superior claim to a judgment lien and that the Receiver-Claimants are entitled to the imposition of a constructive trust over the Defendant Property, the only remaining question is whether the Receiver-Claimants are innocent owners.

As noted, the applicable innocent owner defense is the one set forth in the pre-CAFRA version of 18 U.S.C. § 981(a)(2), which provides that "[n]o property shall be forfeited under [§ 981] to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder."  "The so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant." 755 Forest Road, 985 F.2d at 72.  If a party is "willfully blind" to the wrongful activity, he will not be able to claim a lack of knowledge.  Id.

Congress intended the innocent owner provision of 18 U.S.C. § 981(a)(2) to include equitable interests in property.  The Second Circuit has held that the term "innocent owner" includes

one with an equitable interest in property, including the beneficiary of a constructive trust. Torres, 25 F.3d at 1157; Wetterer, 210 F.3d at 109-10. As the Second Circuit noted, "[t]he Congressional Record indicates that Congress intended this provision to be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized." Torres, 25 F.3d at 1157 (internal quotations omitted).

As noted, an innocent owner can defeat the forfeiture of property that the government has established to be subject to forfeiture. The question as to whether a claimant is an innocent owner is, therefore, an issue between the Government and the claimant seeking to defeat a forfeiture. Here, the Government and the Receiver-Claimants stipulated that the Receiver-Claimants are innocent owners pursuant to 18 U.S.C. § 981(a)(2) and are entitled to the *res* despite the Defendant Property being otherwise subject to forfeiture. The Government and the Receiver-Claimants further stipulated that the Receiver-Claimants' innocent owner defense was not barred by any statute of limitations, laches, waiver, estoppel or any inequitable conduct on the part of the Receiver-Claimants. This stipulation is sufficient for the determination that the Receiver-Claimants are innocent owners because, as noted before, this *in rem* civil forfeiture action only adjudicates the right of the Government to forfeit the property and, if so, whether a claimant can

44

defeat that forfeiture.  See 83 C.J.S. Stipulations § 26 ("Any matter which involves the individual rights or obligations of the parties inter sese may properly be made the subject of a stipulation between them, provided the stipulation is not illegal, unreasonable, or against good morals or sound public policy, and does not interfere with the general powers, duties, and prerogatives of the court.").

The Court concludes that the Receiver-Claimants are innocent owners despite Lacoff's suggestions to the contrary. Lacoff's only evidence to support her contention is a GAO report which concluded that in many cases the victimized Insurance Companies failed to follow proper oversight and compliance practices.  This is not sufficient evidence to establish that the Insurance Companies had knowledge of, or were willfully blind to, Frankel's fraudulent looting of their funds.[13]

Therefore, pursuant to the stipulation and absent any evidence to the contrary, the Receiver-Claimants have satisfied their burden of proving that the Insurance Companies had no knowledge of Frankel's fraud as the term "knowledge" is used in 18 U.S.C. § 981(a)(2) by a preponderance of the evidence.

---

[13] Though the underlying evidence was not presented at trial, the Court does note that after the Receiver-Claimants submitted their petition for remission to the DOJ, the FBI, the IRS, the United States Attorney for the District of Connecticut and the DOJ conducted an investigation of the Insurance Companies' knowledge of Frankel's crimes, and determined that the Insurance Companies did not have knowledge that the Defendant Property was purchased with the proceeds of looted funds.  There was no evidence presented at trial to contradict this finding.

III.  Because the Receiver-Claimants Have Successfully Defeated
the Forfeiture of the Defendant Property There is No Need to
Consider Lacoff's Claim

Because the Court imposes a constructive trust over the
Defendant Property on behalf of the Receiver-Claimants and
because the Court finds that the Receiver-Claimants are innocent
owners as defined under the relevant authorities, the
Government's forfeiture of the Defendant Property is defeated.
Further, because the Receiver-Claimants' claim has higher
priority than Lacoff's judgment lien claim and because
satisfaction of the Receiver-Claimants' claim will leave none of
the *res* remaining, the Court need not evaluate Lacoff's claim to
determine its validity, applicability in this Court or her
status as an innocent owner.

### ORDER OF JUDGMENT

Based on the foregoing facts and conclusions of law, the
Court concludes that the Government has established probable
cause for the forfeiture of the Defendant Property.

The Court further holds that the Receiver-Claimants are
entitled to the imposition of a constructive trust over the
Defendant Property.  The Court therefore imposes a constructive
trust over the Defendant Property for the benefit of the
Receiver-Claimants.

In addition, the Court concludes that the Receiver-Claimants are innocent owners of the Defendant Property pursuant to 18 U.S.C. § 981(a)(2).

Consequently, the Court concludes that, collectively, the Receiver-Claimants have defeated the Government's forfeiture of the Defendant Property.

Accordingly, the Court hereby ORDERS the Government to pay over to the Receiver-Claimants the entire *res*, including accrued interest thereon to date.

The Court further orders the Receiver-Claimants to distribute the *res* amongst them pursuant to their previously agreed-to schedule as modified to preclude the receiver of OSL from taking any share of the *res* and that his share shall be distributed to other Receiver-Claimants as they deem appropriate.

In light of the foregoing, the Court finds that the Receiver-Claimants' cross-claim against Lacoff is moot.  The Court consequently finds that Lacoff's affirmative defenses to the Receiver-Claimants' cross-claim are also moot.

The Court additionally finds that the Receiver-Claimants' Motion to Dismiss Lacoff for lack of standing [Doc. #248] and the Government's Motion to Dismiss Lacoff for lack of standing [Doc. #249] are moot.

The Clerk is directed to enter judgment in accordance with the foregoing and to close this case.

SO ORDERED

_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 22nd day of April, 2010.